Sam **ALSTON**, John **Banchi**, Edward **Champion**, George A. **Freeman**, Leroy L. **Gilbert**, Jr., Arthur G. **Hopson**, David C. **Loder**, Andrew J. **McNeal**, Allyn **Mozitis**, Emanuel **Scott**, Joe **Scates**, and Paul R. **String**, Plaintiffs,

v.

**ATLANTIC ELECTRIC COMPANY,**
Defendant.

**Civil Action No. 96–5453.**

United States District Court,
D. New Jersey.

April 22, 1997.

---

Law Office of Stephen G. Console by Stephen G. Console, Haddon Heights, NJ, Magger Liebenberg & White by James Bucci, Delran, NJ, for Plaintiffs.

Morgan, Lewis & Bockius, L.L.P. by Robert A. White, Lawrence B. Fine, Richard G. Rosenblatt, William J. Delany, Princeton, NJ, for Defendant.

IRENAS, District Judge:

Plaintiffs instituted this action to recover additional severance and pension benefits from their former employer. Defendant filed a motion for partial dismissal. We will grant defendant's motion in part and deny it in part. Plaintiffs' claims for pension benefits are dismissed for failure to state a claim upon which relief can be granted. Plaintiffs' state law claims are dismissed as preempted. Defendant's motion to dismiss plaintiffs' federal claims for additional severance benefits is denied.

## I. FACTS

Twelve former employees [1] of the defendant, Atlantic Electric Company ("Atlan-

---

1. The twelve employees are: Sam Alston ("Alston"), John Banchi ("Banchi"), Edward Cham- pion ("Champion"), George A. Freeman ("Freeman"), Leroy L. Gilbert, Jr. ("Gilbert"), Arthur

tic"),[2] filed the instant complaint on November 14, 1996, challenging their treatment by Atlantic in conjunction with their voluntary retirement from the company. Plaintiffs' claims stem from two disputes with Atlantic: (1) plaintiffs' eligibility for benefits under Atlantic's November 1994 severance package ("the November plan"), and (2) plaintiffs' claimed entitlement to additional pension benefits.

In March 1994, defendant announced that an "early retirement" program was available to production employees who reached age of 55 by December 26, 1995.[3] *See* Compl. ¶ 18. All of the plaintiffs met the age requirements for the program. On April 15, 1994, defendant held a meeting to explain the terms of the program ("the April plan").[4] *See id.* ¶ 20. All plaintiffs except Alston and Mozitis attended the meeting. *See id.* During the meeting, plaintiff Loder asked whether plaintiffs would be entitled to benefits under any other more generous plans that defendant might offer in the future. *See id.* ¶ 22. Plaintiffs allege that David Motil ("Motil"), an employee relations manager, responded as follows: (1) that to the best of his knowledge there would not be a subsequent retirement

package, but that (2) if one were offered while the plaintiffs were still employed by Atlantic, plaintiffs could participate. *See id.* ¶ 23. Plaintiffs further allege that Richard Simonini, manager of employee relations, visited Mozitis at his home, explained the terms of the package to him, and made the same representations regarding a future severance package. *See id.* ¶ 26. Plaintiffs claim that Atlantic employees represented that plaintiffs would be terminated if they did not accept the package. *See id.* ¶ 25.

Atlantic told the employees that they had 45 days to decide whether to accept the April plan. All twelve plaintiffs decided to retire from Atlantic pursuant to the terms of the April plan.[5] Each plaintiff signed a release as a condition of accepting the plan. *See* Compl. ¶ 31. The release did not specifically indicate that by signing it plaintiffs became ineligible for any future severance benefits. *See id.* On November 15, 1994, Atlantic announced a new severance package ("the November plan"). On the face of the plan, all full-time Atlantic employees were eligible. *See id.* ¶ 32. The new plan included more generous benefits than the April plan.[6] The

G. Hopson ("Hopson"), David C. Loder ("Loder"), Andrew J. McNeal ("McNeal"), Allyn Mozitis ("Mozitis"), Emanuel Scott ("Scott"), Joe Scates ("Scates"), and Paul R. String ("String").

2. Defendant points out that the complaint incorrectly identifies the company as "Atlantic Electric Company." The correct name is "Atlantic City Electric Company." *See* Answer at 1 n. 1.

3. Plaintiffs' complaint provides conflicting information as to the cutoff dates for reaching age 55. In ¶ 18, plaintiffs aver that the cutoff date was December 26, 1995. In ¶ 21, plaintiffs represent that the plan included a cutoff date of December 15, 1995. Nevertheless, this difference is immaterial to this motion because defendant does not dispute that all twelve plaintiffs met the plan's age requirements.

4. According to the complaint, the April plan provided:

(1) Employees who were of retirement age on or before December 15, 1995, and agreed to terminate their employment and retire on a date within the Company's discretion sometime between June, 1994 and December 1, 1995 would be eligible to obtain benefits in connection with the termination of their employment. All employees who so retired would

be given two weeks of pay for every full year of service to a maximum of $50,000.
(2) Eligible Employees were given 45 days to consider whether to accept the offer.
(3) The retirement benefits of the Eligible Employees were not otherwise affected by the program; there was no enhancement of any retirement plan benefits.
(4) Eligible Employees who accepted the offer were required to sign a general release of claims against Atlantic Electric.
*See* Compl. ¶ 21.

5. Plaintiffs aver that Alston retired on January 1, 1996, *see* Compl. ¶ 1; Banchi retired on June 1, 1994, *see id.* ¶ 2; Champion retired on November 30, 1995, *see id.* ¶ 3; Freeman retired on December 1, 1995, *see id.* ¶ 4; Gilbert retied on November 1, 1996, *see id.* ¶ 5; Hopson retired on May 1, 1995, *see id.* ¶ 6; Loder retired on December 1, 1995, *see id.* ¶ 7; McNeal retired on May 1, 1995, *see id.* ¶ 8; Mozitis retired on November 30, 1995, *see id.* ¶ 9; Scott retired on March 1, 1995, *see id.* ¶ 10; Scates retired on December 1, 1995, *see id.* ¶ 11; String retired on December 1, 1995, *see id.* ¶ 12.

6. The elements of the November plan were as follows:

(1) Eligible employees who voluntarily retired would be given two weeks of pay for every full

November plan (1) included an additional six months of base pay in addition to severance pay; (2) set the upper limit for severance benefits at one year's salary rather than $50,000; (3) provided for the continuation of health benefits for six months, and (4) provided for outplacement training. *See id.* Plaintiffs aver that although the November plan did not contain a disqualification provision, Atlantic determined that the employees who had accepted the April plan were ineligible. *See id.* ¶¶ 33, 35. Plaintiffs challenge this decision, claiming that they relied on Atlantic's representations that they would be entitled to participate in any future severance packages.

The second dispute arises from plaintiffs' alleged reliance on lump-sum pension payment estimate worksheets. Atlantic's pension plan allows employees to elect to receive their pension at retirement either in monthly installments or in a lump-sum payment. Prior to accepting the April plan, Atlantic gave each plaintiff an estimated calculation of the monthly benefit and the lump-sum payment. *See* Compl. ¶ 37. Lump-sum payments are calculated by multiplying the employee's monthly earned pension by twelve and then multiplying by the "PBGC Factor."[7] The monthly earned pension is calculated by multiplying the number of years served by 1.6% by the employee's final average earnings, divided by twelve. *See id.* ¶ 36. In providing the estimates, Atlantic used the PBGC Factor in effect at that time.

The estimate worksheets distributed to the employees contained several statements, the significance of which is hotly disputed by the parties. First, the sheets state: "Note that these are only estimates and can vary based on actual figures which will be in effect at the time of your retirement. They should not vary however more than a few dollars and are sufficiently close to be relied upon for

planning purposes." Compl. ¶ 38. Moreover, the written estimates indicate that they are "[T]o be used 6 months prior to retirement. PBGC Factors change each January based on U.S. Govt. figures. This worksheet is for estimation and planning only." Atlantic calculated plaintiffs' estimates using the current 1994 PBGC Factor. In 1995, at the time most of the plaintiffs actually left the company, the PBGC Factor had decreased, thereby reducing plaintiffs' actual lump-sum payments. *See id.* ¶ 39. The change in the PBGC Factor only affected the lump-sum payment and had no effect on the amount of the monthly pension payments.

Plaintiffs allege that they based their retirement decisions on Atlantic's representations regarding their eligibility for future severance plans and on the amount of the 1994 lump-sum pension payment estimates and now seek (1) to receive the enhanced severance benefits under the November plan and (2) to receive the larger lump-sum pension payment. Plaintiffs base their claims on the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002, *et seq.*, as well as on several state law theories including the New Jersey Law Against Discrimination ("NJLAD"), fraud, negligent misrepresentation, promissory estoppel, breach of contract, and a violation of the covenant of good faith and fair dealing.

## II. DISCUSSION

### A. Standard of Review

Fed.R.Civ.P. 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) motion, the court will accept the allegations of the complaint as true. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Dismissal of claims under Rule 12(b)(6) should be granted only if "it appears

year of service to a maximum of 52 weeks; they would *also* be paid an *additional* six months (26 weeks) of base pay.
(2) Health care benefits for eligible employees would be continued for six months.
(3) The Company would determine the Eligible Employees' retirement date, which would "typically" be March 1, 1995, but not later than December 31, 1995.

(4) Eligible Employees were provided outplacement training.
(5) Eligible Employees who accepted the offer were required to sign a general release of claims against Atlantic Electric.

7. The PBGC Factor is a number established by the Pension Board Guarantee Corporation each year.

beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.," *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

Although the court must assume as true all facts alleged, "[i]t is not ... proper to assume that the [plaintiff] can prove any facts that it has not alleged." *Associated Gen. Contractors of Calif., Inc., v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983). Also, when "[c]onfronted with [a 12(b)(6) ] motion, the court must review the allegations of *fact* contained in the complaint; for this purpose the court does not consider conclusory recitations of law." *Commonwealth of Pennsylvania v. PepsiCo, Inc.,* 836 F.2d 173, 179 (3d Cir.1988) (emphasis added).[8]

## B. Preemption

 Defendant argues that ERISA preempts Counts Four and Counts Six through Ten, which are state common law claims of breach of fiduciary duty, fraud, negligent misrepresentation, promissory estoppel, breach of contract, and a violation of the duty of good faith and fair dealing. ERISA contains a sweeping preemption clause, which states that ERISA shall "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). The term "State law" includes "all laws, decisions, rules, regulations, or other State action having the effect of law." 29 U.S.C. § 1144(c)(1). The term "relate to" has been construed broadly. *See Pane v. RCA Corp.,* 868 F.2d 631 (3d Cir.1989). The ERISA preemption clause is not limited to " 'state laws specifically designed to affect employee

benefit plans.' " *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 48, 107 S.Ct. 1549, 1553, 95 L.Ed.2d 39 (1987)(quoting *Shaw v. Delta Air Lines,* 463 U.S. 85, 98, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983)). There are two steps for determining whether plaintiffs' state law claims are preempted. First, we must determine if the defendant had an ERISA benefit plan. *See Pane,* 667 F.Supp. 168, 170 (D.N.J.1987), *aff'd,* 868 F.2d 631 (3d Cir.1989). Second, we must analyze whether the state laws "relate to" that plan. *See id.*

### 1. ERISA Plan?

 ERISA covers employee plans that qualify as welfare benefit plans, pension benefit plans, or both. *See* 29 U.S.C. § 1002(3). The parties do not dispute that Atlantic's pension plan "constitutes an employee pension benefit plan under ERISA." Compl. ¶ 36. The harder question is whether the defendant's severance packages constitute ERISA plans. Defendant argues, and plaintiffs deny, that the April and November plans constitute ERISA plans.[9] The term "employee welfare benefit plan" is defined as follows in ERISA:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer.. to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries ... (a) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training pro-

---

8. Plaintiffs allege that defendant's motion to dismiss should be treated as one for summary judgment. Fed.R.Civ.P. 12(b)(6) provides that if, on a motion to dismiss "matters outside the pleading are presented to and *not excluded by* the court, the motion shall be treated as one for summary judgment." Even though the parties have offered affidavits and exhibits, we do not rely on them to decide the motion. Accordingly, we will not treat the motion as one for summary judgment.

9. Defendant argues that plaintiffs concede that both severance plans are ERISA plans, noting

that the complaint states that the plans "constitute welfare benefit plans, as defined by ERISA." *See* Compl. ¶ 44. We are unpersuaded. We cannot treat plaintiffs' statement in paragraph 44 of the complaint as an admission that the plans are covered by ERISA. Plaintiffs have, and are entitled to, plead their claims in the alternative. To assert ERISA violations, plaintiffs must state that the plans are covered by ERISA. However, to assert their state law claims, plaintiffs must argue in the alternative (as they do) that the court may find that the severance plans are not subject to ERISA. *See* Compl. ¶ 64.

grams, or day care centers, scholarship funds, or prepaid legal services.

29 U.S.C. § 1002(1).

■ Although severance benefits are not specifically mentioned in § 1002(1), courts have determined that most, but not all, severance packages qualify as ERISA plans. *See Schonholz v. Long Island Jewish Med., Ctr.,* 87 F.3d 72, 75 (2d Cir.1996). ERISA applies to severance benefits where the employer's program includes an ongoing administrative scheme. *See Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 12, 107 S.Ct. 2211, 2218, 96 L.Ed.2d 1 (1987)(upholding state statute because requiring employers to make a one-time severance payment to employees did not create an employee welfare benefit plan). A one-time obligation, such as a single lump-sum payment, creates no need for an ongoing administrative program for processing claims and paying benefits. *See id.*

Courts have looked to a variety of factors to determine whether a severance plan constitutes an employee welfare benefits plan. *See Bogue v. Ampex Corp.,* 976 F.2d 1319, 1323 (9th Cir.1992)(examining whether the program requires managerial discretion in its administration); *Belanger v. Wyman–Gordon Co.,* 71 F.3d 451, 455 (1st Cir.1995)(looking at whether a reasonable employee would perceive an ongoing commitment by the employer to provide employee benefits); *Fontenot v. NL Indus., Inc.,* 953 F.2d 960, 963 (5th Cir.1992)(en banc)(determining whether employer analyzed circumstances of each employee separately in light of certain criteria)(citing *Pane v. RCA Corp.,* 667 F.Supp. 168, 170–71 (D.N.J.1987), *aff'd,* 868 F.2d 631 (3d Cir.1989)).

In the case at bar, the April plan provided each employee with two weeks pay for every full year of service to a maximum of $50,000. *See* Compl. ¶ 21. From the facts as pled in the complaint, it is difficult for us to discern whether the employer needed to establish an ongoing administrative scheme to implement the program. The April plan appears to involve a one-time severance payment that requires only simple arithmetic calculations and that would fall short of requiring an ongoing administrative scheme for its implementation-thereby disqualifying it from ERISA's coverage. *See, e.g.. James v. Fleet/Norstar Fin. Group, Inc.,* 992 F.2d 463, 466–67 (2d Cir.1993)(offering employees sixty days of additional pay, either in a lump sum or in bi-weekly payments, for remaining at their jobs until office closed did not constitute ERISA plan because no administrative scheme was needed). Nevertheless, from the face of the complaint, we do not have all the details relating to the administration of the April plan or to the need for an ongoing administrative structure. Therefore, we will reserve judgment as to whether the April plan constitutes an ERISA plan.

■ The November plan, however, appears to require an administrative scheme for its implementation. That plan provided for six months of continued health care benefits and for outplacement training. *See* Compl. ¶ 32. Not only are medical benefits and training programs specifically mentioned in 29 U.S.C. § 1002(1), but also they clearly require an ongoing management scheme for their administration. Under the November plan, Atlantic assumes a responsibility to pay benefits on a regular basis and has periodic demands that create a need for financial coordination and control. *See Fort Halifax,* 482 U.S. at 12, 107 S.Ct. at 2218. Therefore, we find that the November plan constituted a welfare benefits plan under ERISA.

### 2. *Relatedness*

■ The parties agree that the pension plan constitutes an ERISA plan. Thus, we need only determine whether plaintiffs' state law claims seeking pension benefits relate to that plan. Plaintiffs assert a claim for pension benefits in Count Eight under state law theory of promissory estoppel. *See* Compl. ¶ 91. We find that this claim relates to the defendant's administration of the pension plan—it involves the defendant's calculation of lump-sum payments—and is preempted.

■ The remainder of plaintiffs' state claims seek recovery of additional severance benefits under the November plan. Counts Four, Six, Seven, Eight, Nine, and Ten assert claims for breach of fiduciary duty, fraud, negligent misrepresentation, promissory estoppel, breach of contract, and a viola-

tion of the covenant of good faith and fair dealing. Plaintiffs seek relief under New Jersey law "in the event that the Court determines that the severance plans do not constitute welfare benefit plans under ERISA or to the extent that plaintiffs' claims are not deemed to 'relate to' the plans." Compl. ¶ 64.

We have already found that the November plan is an ERISA plan. Therefore, these claims could only survive if we find that they do not "relate to" the November plan. On the contrary, we find that all of the claims relate to the ERISA plan, as they all offer alternative theories of why Atlantic improperly denied plaintiffs benefits under that plan.

■ To support their breach of fiduciary duty claim in Count Four, plaintiffs allege that Atlantic failed to "fully and fairly explain to plaintiffs the effect that their election of the April, 1994 program would have on their right to participate in future retirement programs." Compl. ¶ 66. Moreover, plaintiffs claim that Atlantic "wrongfully refused to allow plaintiffs to participate in the November, 1994 program." Id. ¶ 67. This claim relates to the employer's administration of its benefits plan and is therefore preempted. See Glaziers and Glassworkers v. Newbridge Securities, 877 F.Supp. 948, 955 (E.D.Pa. 1995), affd. in part and rev'd in part, 93 F.3d 1171, 1185–86 (3d Cir.1996)(holding that state law claims for breach of fiduciary duty are preempted by ERISA).

Plaintiffs' claims of fraud, negligent misrepresentation, and promissory estoppel in Counts Six, Seven, and Eight respectively, allege that Atlantic provided false information to induce them to retire under the April plan. See Compl. ¶ 82–84; 86–89; 91–94. Plaintiffs maintain that they relied on this information and were subsequently injured by Atlantic's decision to exclude them from the November plan. These three claims, therefore, are alternative theories to hold Atlantic liable for its administration of benefits that are governed by ERISA. Accord-

ingly, these state law causes of action are also preempted by ERISA.

■ In Count Nine, plaintiffs allege that defendant breached its contract [10] with plaintiffs by refusing to offer them the November plan. See Compl. ¶¶ 96–98. Once again, this state law claim is related to the employer's administration of its ERISA benefits and is preempted. See Pane, 667 F.Supp. at 172 (finding that claim for breach of severance agreement was preempted by ERISA because plaintiff sought enforcement of his rights under a severance program, which was found to be an ERISA plan). Finally, Count Ten alleges a state law violation of defendant's duty of good faith and fair dealing. See Compl. ¶ 103. Plaintiffs challenge defendant's refusal to allow plaintiffs to participate in the November plan. Therefore, the claim is related to the ERISA plan and is preempted. See Pane, 868 F.2d at 635.

■ In Counts Four, and Six through Ten, plaintiffs claim they are entitled to benefits stemming from Atlantic's allegedly improper administration of the November severance plan governed by ERISA. These claims relate to an ERISA plan and are completely preempted. Accordingly, as to these counts of the complaint, defendant's motion to dismiss is granted.

## C. NJLAD

■ Plaintiffs allege that Atlantic violated the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5–1 et seq., by engaging in the following conduct: (1) offering the April plan only to individuals over 55 and then offering a more generous package to all employees in November; (2) disqualifying plaintiffs from the November plan; (3) misrepresenting the facts concerning the retirement benefits; (4) manipulating termination dates; and (5) creating the fear in plaintiffs that if they did not accept the April plan, they would be terminated with less generous severance. See Compl. ¶ 75. Plaintiffs allege that the aforementioned conduct constituted disparate treatment pursu-

---

10. The contract referred to is the release agreement—coupled with the representations made at the April meeting—which Atlantic required plaintiffs to sign upon their acceptance of the April plan.

ant to a pattern and practice of age discrimination. *See id.* Also, plaintiffs assert that disqualifying from the November plan those employees who had accepted the April plan resulted in a disparate impact on older employees. *See id.* ¶ 76. Defendant argues that plaintiffs' NJLAD claims are preempted by ERISA.

First, we must ask whether the NJLAD claims relate to an employee benefit plan covered by ERISA. The NJLAD, like the New York civil rights law at issue in *Shaw*, forbids employers from structuring their plans in a manner that discriminates on the basis of age. The *Shaw* Court found that the statute "related to" the employee benefit plan. *See Shaw*, 463 U.S. at 96–97, 103 S.Ct. at 2899–2900. Accordingly, we find that the NJLAD claim is related to the November benefits plan. Thus, the NJLAD claims are preempted unless they fall into an exemption.

 Section 514(d) of ERISA, 29 U.S.C. § 1144(d), provides that "[n]othing in this title shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States ... or any rule or regulation issued under any such law." 29 U.S.C. § 1144(d). Accordingly, *federal* anti-discrimination statutes are not preempted by ERISA. Under this clause, a state anti-discrimination statute could be preserved if its extinction would impair a federal law. *See Shaw*, 463 U.S. at 108–09, 103 S.Ct. at 2905–06. In *Shaw*, a Title VII case, the Court held that in order to determine whether state anti-discrimination statutes are preempted, courts and agencies must determine whether the employment practices in question are prohibited by Title VII. *See id.*

at 105–06, 103 S.Ct. at 2904–05. If the practices are not prohibited under Title VII, then the state law is preempted by ERISA. *See id.* at 106, 103 S.Ct. at 2904–05.

Like Title VII, the federal Age Discrimination in Employment Act ("ADEA") requires a claimant to exhaust administrative remedies before filing suit in federal court. *See* 29 U.S.C. § 626(d). Accordingly, we can apply *Shaw's* logic to an age discrimination case by analogy. In order to determine whether plaintiffs' NJLAD claims are preempted, we must determine whether the employment practices in question would be prohibited by the ADEA.

The employment practices here would not be actionable under the ADEA because plaintiffs have failed to exhaust their administrative remedies—both state and federal. Plaintiffs did not file a timely charge of age discrimination with the appropriate administrative agency. Thus, to allow plaintiffs' NJLAD claim to survive preemption would be to permit plaintiffs to exercise rights to which they would not be entitled under federal law. An age discrimination suit brought under a state statute, such as NJLAD, which has a longer period of limitation than its federal counterpart and does not require any state mediative process, does not further the goals of the ADEA so as to escape ERISA preemption. *See Nolan v. Otis Elevator Co.*, 102 N.J. 30, 46, 505 A.2d 580, *cert. denied*, 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 38 (1986). In essence, preemption of plaintiffs' NJLAD claims in no way impairs federal law. Accordingly, defendant's motion to dismiss Count Five of the complaint is granted.[11]

---

**11.** Even if we allowed plaintiffs' NJLAD counts to survive complete preemption, portions of those claims would still be preempted. First, plaintiffs' claim based on a disparate impact theory of discrimination may exceed the scope of relief available under the ADEA. *See Hazen Paper v. Biggins*, 507 U.S. 604, 617, 113 S.Ct. 1701, 1710, 123 L.Ed.2d 338 (1993)(Kennedy, J., concurring)("[t]here are substantial arguments that it is improper to carry over disparate impact analysis from Title VII to the ADEA."); *DiBiase v. SmithKline Beecham Corp.*, 48 F.3d 719, 732 (3d Cir.), cert. denied, —— U.S. ——, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995)(Greenberg, J., concurring)(("[i]t is doubtful that traditional disparate impact theory is a viable theory of liability

under the ADEA.")). Similarly, plaintiffs' claims for punitive damages might also be preempted. It is unlikely that punitive damages are available for an ADEA claim. Although the Third Circuit has not decided the issue, every circuit court that has decided the issue has found punitive damages unavailable to ADEA claimants. *See Davis v. First Nat'l Bank of Killeen Texas*, 976 F.2d 944, 948 (5th Cir.), *cert. denied*, 508 U.S. 910, 113 S.Ct. 2341, 124 L.Ed.2d 251 (1993); *Bruno v. Western Elec. Co.*, 829 F.2d 957, 966–67 (10th Cir.1987); *Goldstein v. Manhattan Indus. Inc.*, 758 F.2d 1435, 1446 (11th Cir.), *cert. denied*, 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985); *Johnson v. Al Tech Specialties Steel Corp.*, 731 F.2d 143, 146–48 (2d Cir.1984).

### D. Remaining Claims for Severance Benefits

In Counts One, Two, and Three of the complaint, plaintiffs assert claims for severance benefits under ERISA.[12] Defendant attacks various portions of these claims. However, defendant concedes that certain parts of these counts should survive this motion. Defendant attacks Counts One and Two to the extent that they seek relief pursuant to an equitable estoppel theory. Plaintiffs allege that under ERISA and its accompanying federal common law principles, Atlantic should be equitably estopped from denying plaintiffs participation in the November severance plan.

Defendant argues that the theory of equitable estoppel is inapplicable here. We decline to determine at this point whether it is appropriate to extend the principles of equitable estoppel—as established under the body of ERISA federal common law—to the issues in this case.[13] The complaint alleges that plaintiffs believe they are entitled to benefits under the November severance plan despite their signing of the April release. They are, in essence, claiming that the employer's representation that they would be entitled to participate in any future severance packages amends their releases and entitles them to additional benefits.

Defendant argues that plaintiffs have failed to satisfy the three elements of an estoppel claim. In the Third Circuit, to establish a claim for equitable estoppel under ERISA, a plaintiff must prove (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances. *See Fischer v. Philadelphia Elec. Co.*, 96 F.3d 1533, 1543 (3d Cir.1996)(applying equitable estoppel where employees, who retired before announcement of early retirement plan, claimed that employer, prior to their retirement, materially misrepresented that it was not considering such a plan but finding that plaintiffs failed to prove estoppel because the district court found that no changes were under consideration at the time of plaintiffs' inquiry), *cert. denied*, — U.S. —, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997).

Plaintiffs allege that Atlantic's representation that plaintiffs could receive benefits under a future plan materially affected plaintiffs' decision to retire under the April plan. *See* Compl. ¶¶ 23, 26. If we assume the facts pled as true, plaintiffs have made a sufficient showing to overcome a motion to dismiss on the equitable estoppel theory of liability. From the face of the complaint, we know that a representation was made; that at the April meeting one of the plaintiffs inquired about eligibility for future severance plans, thereby revealing the materiality of the issue to their retirement decision; and finally, we know that plaintiffs did in fact retire from Atlantic.

We also find that plaintiffs have provided sufficient facts to support that "ex-

---

12. ERISA creates a cause of action for participants and beneficiaries of ERISA plans pursuant to 29 U.S.C. § 1132(a). Nevertheless, in light of ERISA's broad preemption clause, the statute is virtually silent on which interpretive tools courts should use to analyze § 1132 claims. Therefore, the Supreme Court, based on legislative history, has approved the development of a body of "federal common law" to deal with "issues involving rights and obligations under private welfare and pension plans." *Franchise Tax Bd. v. Laborers Vacation Trust*, 463 U.S. 1, 24 n. 26, 103 S.Ct. 2841, 2854 n. 26, 77 L.Ed.2d 420 (1983)(citing 120 Cong. Rec. 29942 (1974)(remarks of Sen. Javits)); *see also Pilot Life*, 481 U.S. at 56, 107 S.Ct. at 1557.

13. We are aware of the line of cases which unequivocally reject equitable estoppel where ERISA plan participants claim that their employer should be estopped from denying them additional benefits because the employer made an oral representation that should modify the written ERISA plan. *See Degan v. Ford Motor Co.*, 869 F.2d 889, 895 (5th Cir.1989); *Straub v. Western Union Tel. Co.*, 851 F.2d 1262, 1265 (10th Cir.1988). However, this case is remarkably different. Here, plaintiffs are not trying to amend the November plan, which by its terms includes them, but rather they are trying to enjoy its benefits. The issue here is the impact of Motil's alleged oral statements on the release, signed by the plaintiffs, a release which contains a vague provision, stating that Atlantic does not have "any obligation to provide [plaintiffs] at any time in the future any payments, benefits, or considerations other than those [provided for in the release], except for *any claims regarding pension or other retirement benefits which may arise in the future.*" Def. Reply Mem. at ¶ 4 (emphasis added). Therefore, as we view plaintiffs' claims at this point in the litigation, we cannot say that equitable estoppel is wholly inapplicable.

traordinary circumstances" may have existed at the time the releases were signed. To determine whether "extraordinary circumstances" exist, the Third Circuit has taken several approaches. *See Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1553 (3d Cir. 1996). First, the court has examined whether the employer has engaged in affirmative acts of fraud or similarly inequitable conduct. *See id.* At this point, we cannot say that there exists no set of facts that could support a finding of fraud or inequitable conduct by Atlantic. Alternatively, the Third Circuit has looked to whether there was a "network of misrepresentations" made by the employer to the employee. From the face of the complaint alone, there are at least two instances where the employer, in response to direct inquiries, represented that the plaintiffs would be entitled to benefits under the November plan. *See* Compl. ¶¶ 23, 26. Finally, the Circuit has also considered whether the plaintiffs were particularly vulnerable. *See Kurz*, 96 F.3d at 1553. In this case, plaintiffs allege that Atlantic induced them to take the April plan by threatening to fire them without severance pay. *See* Compl. ¶ 25. If Atlantic truly applied such pressure, and we make no finding on that issue, there could be some basis for finding that the plaintiffs were "vulnerable."

Because we can glean from the face of the complaint facts that might support a claim for equitable estoppel, we must deny defendant's motion to dismiss Count Two to the extent it concerns benefits due under the November plan.[14] Defendant has not moved to dismiss plaintiffs' claims in Count One and Three to the extent that they assert claims for severance benefits due under the November plan. Therefore, those claims also remain for further disposition.

### E. Claims for Additional Pension Benefits

■ In Counts One, Two, and Three, plaintiffs assert claims under ERISA to recover additional pension benefits calculated with the "appropriate PBGC rate." The essence of plaintiffs' allegations is that they based their April 1994 decisions to retire and their election of a lump-sum pension payment (rather than monthly installments) on Atlantic's pension estimates. The estimates were prepared in 1994 using the 1994 PBGC multiplier. Plaintiffs' actual pension payments were calculated with the PBGC multiplier in effect at the time they left the company. Most of the plaintiffs retired in 1995. The 1995 PBGC Factor was lower than the 1994 figure. In order for plaintiffs to prevail, we must find that Atlantic was somehow bound to pay out the amount of benefits listed on the pension estimate worksheets. We find that the facts as alleged cannot support such a finding.[15]

The pension payment worksheet clearly warned the plaintiffs that the numbers used to calculate the estimates could fluctuate in the future. *See* Compl. ¶ 38 ("Note that these are only estimates and can vary based on actual figures which will be in effect at the time of your retirement. They should not vary however more than a few dollars and are sufficiently close to be relied upon for planning purposes."). Plaintiffs argue that this statement amounted to a guarantee that the fluctuation of the PBGC Factor would not change the total payment by more than a "few dollars." We disagree. The worksheet contained a separate warning, advising the employee of the variability of the PBGC Factor. The warning stated that the estimates

---

14. Defendant claims that plaintiffs' equitable estoppel claims must be dismissed because plaintiffs must "do more than merely make out the 'ordinary elements' of equitable estoppel under ERISA." *See* Def. Mem. Supp. Summ. J. at 26 (citing *Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1553 (3d Cir.1996)). In both *Fischer* and *Kurz*, however, the determination that plaintiffs failed to establish equitable estoppel was made after a full-blown bench trial. All we have here is a pre-discovery motion, hardly a record from which we can definitively conclude that estoppel is inapplicable.

15. Defendant argues that plaintiffs' federal claims for additional pension benefits fail to state a claim upon which relief can be granted because plaintiffs' theory of recovery—equitable estoppel—is inapplicable. The issue of whether federal common law principles of equitable estoppel should apply here is somewhat vague. Nevertheless, we need not resolve it to dispose of plaintiffs' claims.

were "[t]o be used 6 months prior to retirement. PBGC Factors change each January based on U.S. Govt. figures. This worksheet is for estimation and planning only."

In our view, therefore, these warnings, taken together, lead to the conclusion Atlantic did not guarantee that the PBGC Factor would not change. The figures that the employer asserted would vary only by a "few dollars" were those figures over which the employer had control, such as an employee's total years of service and average earnings. Atlantic had no control over the PBGC Factor and told its employees that the government set the figure. Nor did Atlantic make any representations as to whether the rate would go up or down. Furthermore, all plaintiffs except Banchi, retired more than six months after the estimates were distributed.

Finally, the change in the PBGC Factor only affected the lump-sum calculations and had no effect on the amount of the monthly pension payments. There is nothing in the complaint that suggests that Atlantic required plaintiffs to commit to the lump-sum option at the time they signed the releases in April 1994. Therefore, as far as we can tell, plaintiffs, at the time they left the company (and became aware of the change in the PBGC Factor) were still free to elect the month-to-month payment option and receive monthly payments identical to those provided on the estimate worksheets.

In light of these facts, it is inconceivable to us that plaintiffs would be entitled to additional pension benefits under any theory of liability. It was not reasonable for them to assume that the PBGC Factor used in the estimates would not change. If they made that assumption, their reliance on those figures was unreasonable. Moreover, plaintiffs still had the option to receive monthly payments that were identical to the estimates.

■ Finally, we are unpersuaded by plaintiffs' basic assumption: that the pension payment calculated with the lower PBGC Factor was unfair to them. The PBGC rate is tied to the interest rate, and therefore, to the expected rate of return on investments. *See* 29 C.F.R. § 4044.75 app. B, tbls. 1,2.[16] The lump-sum payment is designed to provide the employee with an amount that has the same economic value as the future right to receive a monthly pension. When interest rates go up, the PBGC lowers the Factor on the theory that the retiree can get the same return by investing a smaller sum at a higher rate of interest. Conversely, when interest rates drop, the Factor increases because it takes a larger investment to get an equivalent return. Although the absolute value of the lump-sum payment in 1994 would have been higher than the one actually made in 1995, there is nothing in the complaint which suggest that the 1995 payment did not represent the present value at that time of the right to receive monthly pension payments in the future.

We agree with defendant that to the extent plaintiffs seek to recover additional pension benefits based on the 1994 estimates of their lump-sum payments, this complaint fails to state a claim on which relief can be granted. Accordingly, those portions of Counts One, Two, and Three that relate to pension benefits are dismissed.[17] Those portions of Counts One, Two, and Three that relate to severance benefits will remain.[18]

### III. CONCLUSION

Defendant's motion to dismiss is granted in part and denied in part. Counts One,

---

**16.** The PBGC is also tied to life expectancy, and will therefore vary according to an employee's age at the time of retirement.

**17.** Although we are granting the motion to dismiss as to all federal claims relating to the pension benefits, we note that plaintiffs Banehi and Alston cannot establish that they were injured by reliance on the 1994 estimates. Banchi retired on June 1, 1994. Therefore, Banchi's estimated lump-sum payments and his actual payments were both calculated using the 1994 PBGC Factor. In addition, plaintiff Alston retired on January 1, 1996. Alston's lump-sum payment was calculated with the 1996 PBGC Factor, which was identical to the 1994 Factor.

**18.** Defendant contends, and plaintiffs concede, *see* Pl. Mem. Opp'n Summ. J. at 33, that a jury trial is not permitted for the ERISA claims. *See, e.g., Pane v. RCA Corp.*, 868 F.2d 631, 636 (3d Cir.1989). Because all state law claims are preempted, plaintiffs' demand for a jury will be struck from the complaint.

Two, and Three of the complaint survive to the extent that plaintiffs seek severance benefits pursuant to the November plan under ERISA. Plaintiff Banchi's claims for such severance benefits are dismissed because he left the company before the November plan was announced. Counts One, Two, and Three are dismissed to the extent that plaintiffs seek additional pension benefits based on the 1994 lump-sum payment estimates. Counts Four through Ten are state law claims that relate to an ERISA plan and are therefore completely preempted. Plaintiffs jury demand is struck from the complaint. An appropriate order will issue on even date herewith.